Gabriel Del Virginia, Esq. (GDV-4951)
**LAW OFFICES OF GABRIEL DEL VIRGINIA**
*Attorneys for the Debtor*
*and Debtor in Possession.*
488 Madison Avenue, 19th Floor,
New York, New York 10022.
Telephone: 212-371-5478
Facsimile: 212-371-0460
*gabriel.delvirginia@verizon.net*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------x
In re:

NATURAL SURROUNDINGS, INC.,

Debtor.

----------------------------------x

Chapter 11

Case No. 10-B-14204
(alg)

*THE DEBTOR IN THIS CASE IS A SMALL BUSINESS.  AS A RESULT, THE DEBTOR IS PERMITTED TO DISTRIBUTE AND HAS DISTRIBUTED THIS PLAN AS A DISCLOSURE STATEMENT TO PROVIDE YOU WITH ADEQUATE INFORMATION FOR YOU TO CAST YOUR BALLOT BEFORE ITS FINAL APPROVAL BY THE COURT.  IF AN OBJECTION TO THIS PLAN AS A DISCLOSURE STATEMENT IS FILED BY A PARTY IN INTEREST, FINAL APPROVAL OF THIS PLAN AS A DISCLOSURE STATEMENT WILL BE CONSIDERED AT OR BEFORE THE HEARING ON CONFIRMATION OF THE PLAN.*

*THIS PLAN CONTAINS RELEASES AND INJUNCTIONS INTENDED TO PROTECT THE DEBTOR FROM SUITS OR CLAIMS THAT MAY BE ASSERTED BY CREDITORS OR OTHER PARTIES-IN-INTEREST.  YOU ARE ENCOURAGED TO READ ARTICLE X FOR DETAILS ABOUT SUCH RELEASES AND INJUNCTIONS.*

<u>**SECOND AMENDED CHAPTER 11 PLAN OF REORGANIZATION**</u>


Natural Surroundings, Inc. hereby proposes the following Second Amended Chapter 11 Plan of Reorganization pursuant to the provisions of chapter 11 of the United States Bankruptcy Code.


**I**


<u>**INTRODUCTION.**</u>


The Debtor filed its voluntary petition for reorganization under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York.  The case is assigned to the Honorable Allan L. Gropper, United States Bankruptcy Judge.  On August 3, 2010, the Debtor filed a Plan with the Bankruptcy Court, an amended plan and disclosure

statement on January 31, 2012, and this second amended plan on March , 2012.  On March 31, 2012, the Debtor submitted the Plan for the Bankruptcy Court to conditionally approve the Plan as a disclosure statement pursuant to section 1125 of the Bankruptcy Code.  On _____, 2012, the Bankruptcy Court approved that a vote to accept or reject this Plan may be solicited from a holder of a Claim or Equity Interest based upon this Plan alone.  Such actions, however, does not imply Court approval or disapproval of the Plan, or that objections thereto cannot be interposed.

1.01 The Purpose of a Disclosure Statement.

The purpose of a disclosure statement is to provide creditors and holders of interests with such information as would enable a hypothetical, reasonable individual or entity typical of the holders of claims or interests to make informed judgments in voting on the Plan.  Because the Debtor is a small business, as defined by the Bankruptcy Code, this document is designed to be both a plan of reorganization and a disclosure statement.  The disclosure statement portion of this Plan necessarily involves a series of compromises between extensive "raw data" and the legal language in documents or statutes on the one hand and considerations of readability and usefulness on the other.  For further information you should examine the following pages carefully and you may wish to consult your legal and financial advisors.

1.02 Acceptance and Confirmation.

You are urged to carefully read the contents of this Plan before making your decision to accept or reject the Plan.  Particular attention should be directed to the provisions of the plan affecting or impairing your rights as they existed before the institution of this case.

*NO REPRESENTATIONS CONCERNING THE DEBTOR'S OPERATIONS PARTICULARLY AS TO THE VALUE OF ANY OF ITS PROPERTY ARE AUTHORIZED BY THE DEBTOR EXCEPT AS SET FORTH HEREIN.  IN DECIDING WHETHER TO ACCEPT THE PLAN, YOU SHOULD NOT RELY UPON ANY REPRESENTATIONS OR INDUCEMENTS OTHER THAN THOSE IN THIS PLAN.*

2

The Bankruptcy Court has fixed      , **2012**, as the date by which holders of claims against the Debtor must vote to accept or reject the Plan.  Creditors entitled to vote may vote by filling out the enclosed ballot and sending it in the envelope provided for that purpose to:

LAW OFFICES OF GABRIEL DEL VIRGINIA
488 Madison Avenue-19th Floor,
New York, New York 1022.
Attention: Gabriel Del Virginia, Esq.

In order to be counted, Ballots must be *received* by 5:00 p.m. on      , 2012.

The vote of each creditor is important.  Creditors whose claims are not impaired by the Plan may not vote as they are conclusively presumed to have accepted the Plan.  In order for the Plan to be accepted by any class of creditors, it must be accepted by creditors who hold at least two-thirds in dollar amount of the claims in such class as to which votes are cast, and who comprise more than one-half of the voting creditors holding claims in such class.  THESE CALCULATIONS ARE BASED ONLY ON THE CLAIMS AMOUNTS AND NUMBERS OF CREDITORS WHO ACTUALLY VOTE.

## 1.03 Notice of Hearing

On      , 2012, at 10:00 a.m., a hearing will be held before the Honorable Allan L. Gropper, United States Bankruptcy Judge, at the United States Bankruptcy Court, One Bowling Green, Alexander Hamilton Courthouse, New York, New York 10004 to consider the Debtor's request for confirmation of the Plan (the "Confirmation Hearing").  The Confirmation Hearing may be continued from time to time with notice only to those who have filed timely objections or answers.  The Confirmation Hearing may also be continued from time to time without further notice, by announcement in open court on the day of the scheduled hearing or any continuance thereof.

Any creditor or party-in-interest who wishes to object to confirmation of the Plan or to final approval of the Disclosure Statement, must file a written objection with the Clerk of the Bankruptcy Court, One Bowling Green, Alexander Hamilton Courthouse, New York, New York 10004 and serve copies on counsel to the Debtor whose name and address appears on the cover page of

3

this Plan.   Any objections must be filed with the United States Bankruptcy Court on or before 5:00 p.m. EDT and received by counsel by          , 2012.

Under section 1125(f) of the Bankruptcy Code, the Bankruptcy Court has preliminarily approved that a vote to accept or reject this Plan may be solicited from a holder of a Claim or Equity Interest based upon this Plan alone.

THE DEBTOR BELIEVES THAT THE PLAN PROVIDES FOR THE BEST AVAILABLE RECOVERY TO ITS CREDITORS.  THE DEBTOR RECOMMENDS THAT HOLDERS OF CLAIMS VOTE TO ACCEPT THE PLAN.
ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTOR ARE ENCOURAGED TO READ THIS PLAN IN ITS ENTIRETY; ALTHOUGH ONLY CREDITORS ENTITLED TO VOTE MAY VOTE TO ACCEPT OR TO REJECT THIS PLAN.  SUBJECT TO CERTAIN RESTRICTIONS AND REQUIREMENTS SET FORTH IN THIS PLAN, THE DEBTOR RESERVES THE RIGHT TO ALTER, AMEND, MODIFY, REVOKE OR WITHDRAW THIS PLAN BEFORE ITS SUBSTANTIAL CONSUMMATION.

The rules of construction set out in section 102 of the Bankruptcy Code shall apply to the construction of the terms and provisions set forth in this Plan.

1.04 Funding of the Plan.

In its Plan, the Debtor will be satisfying creditors' claims by payments from its ongoing operations, and funds contributed by Mr. Sidney Buckwald, the father of its principal, Mr. Steven Buckwald.

1.05 Acceptance and Confirmation.

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met.  Among the requirements for confirmation of a plan are that the Plan is (I) accepted by all impaired classes of Claims and Interests or, if rejected by an impaired class, that the plan "does not discriminate unfairly" and is "fair and equitable" as to such class, (I) feasible, and (ii) in the "best interests of creditors and holders of interests impaired under the plan.

In order for the Plan to be accepted by any class, it must be accepted by creditors who hold at least two-thirds in dollar amount of the claims in such class as to which votes are cast, and who comprise more than one-half of the voting creditors

holding claims in such class. Creditors whose Claims are not impaired by the Plan may not vote, as they are conclusively presumed, pursuant to the Bankruptcy Code, to have accepted the Plan. Because the Plan does not impair holders of certain Claims, acceptances will not be solicited from those holders of claims.

If any impaired class does not accept the Plan, the Debtor may nevertheless seek confirmation of the Plan. To obtain such confirmation, it must be demonstrated to the Bankruptcy Court that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to each dissenting class.

Feasibility: As a condition to confirmation of the Plan, § 1129(a)(ii) of the Bankruptcy Code requires that confirmation of the Plan is not likely to be followed by the liquidation of the Debtor, unless such liquidation is proposed in the plan. As the Plan provides for the Debtor to be relieved of a significant amount of its Debt, the Debtor believes that the Plan meets this "feasibility" requirement and that it will be able to successfully operate as a going concern with this hardship abated.

## 1.07 Releases.

Under this Plan, the Debtor will release certain parties of Claims. These releases are described in detail in the Plan, below.

## 1.08 "Best Interests" Test.

Confirmation of the Plan also requires that each claimant either (I) accept the Plan or (ii) receive or retain under the Plan property of a value, as of the Effective Date of the Plan, that is not less than the value such claimant would receive or retain if the Debtor would liquidate under chapter 7 of the Bankruptcy Code.

To determine what creditors and holders of interests would receive if the Debtor as liquidated under chapter 7 of the Bankruptcy Code, the Bankruptcy Court must determine the dollar amount that would be generated from the liquidation of the Debtor's remaining unencumbered assets and properties in the contact of a chapter 7 liquidation case. Such cash amount may be further reduced by additional administrative and priority claims that may result from the termination of the Debtor's business and the use of chapter 7 for the purposes of liquidation. Here, the

Debtor has no tangible assets.  Accordingly, the liquidation of the Debtor's assets would not yield a better recovery to creditors.

The Debtor's costs of liquidation under chapter 7 would include the fees payable to a trustee in bankruptcy.  In addition, Claims might arise by reason of breach or rejection of obligations incurred and the lease entered into by the Debtor during the pendency of the Chapter 11 Case.  The foregoing types of Claims and other Claims that might arise in a liquidation case or result from the pending Chapter 11 Case, including any unpaid expenses incurred by the Debtor during the Chapter 11 Case, would be paid in full from liquidation proceeds before the balance of those proceeds would be made available to pay prepetition Claims.

To determine if the Plan is in the best interests of each impaired Class, the present value of the distributions from the proceeds of a liquidation of the Debtor's remaining unencumbered assets and properties, after subtracting the amounts attributable to the foregoing Claims, must be compared with the value of the property offered to such Classes of Claims under the Plan.

The Debtor believes that comparing the value of the distribution available through chapter 7 liquidation to the value obtainable under the Plan reveals that creditors will receive far greater value under the Plan.  Thus, the Plan satisfies the "best interests of creditors test."

1.09 Certain Federal Income Tax Consequences.

The confirmation and execution of the Plan may have tax consequences to holders of Claims and Interests.  The Debtor does not offer an opinion as to any federal, state, local or other tax consequences to holders of Claims and interest as a result of the confirmation of the Plan.

1.10 General Tax Consequences.

*ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISERS WITH RESPECT TO THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN.  THIS DISCLOSURE STATEMENT IS NOT INTENDED, AND SHOULD NOT BE CONSTRUED, AS LEGAL OR TAX ADVICE TO ANY CREDITOR.*

## 1.11 Alternatives to Confirmation and Consummation of the Plan.

Liquidation under Chapter 7.  If the Plan is not confirmed and consummated, the theoretical alternatives include: (a) liquidation of the Debtor under Chapter 7 of the Bankruptcy Code, or (b) an alternative plan of reorganization.

If no plan can be confirmed, the Debtor's bankruptcy case likely will be converted to a case under chapter 7 of the Bankruptcy Code in which a trustee would be elected or appointed to liquidate the assets of the Debtor for distribution to its creditors in accordance with the priorities established by the Bankruptcy Code.  The Debtor estimates that under Chapter 7 of the Bankruptcy Code, all unsecured creditors would receive a distribution of far less than that proposed by this Plan because, aside from the Debtor's goodwill and its security deposit with its landlord, the Debtor has no assets for a chapter 7 trustee to liquidate, as JP Morgan Chase Bank holds a blanket lien on all assets.  A liquidation analysis prepared by the Debtor is attached hereto as Exhibit B, and made a part hereof.

## 1.11 Alternative Plan of Reorganization.

If the Plan is not confirmed, the Debtor or any other party in interest could attempt to formulate a different plan.  Such a plan might involve a complete liquidation of the Debtor's business.  Because the Debtor has no tangible assets to liquidate the Plan, as proposed, will yield the greatest possible recovery for creditors in that unsecured creditors will receive an approximately five percent dividend.  Thus, the Plan enables creditors and all parties-in-interest to realize the most value under the circumstances.

## 1.12 Other information.

Inquiries regarding information not contained in this Plan may be made by contacting Gabriel Del Virginia, Esq., Law Offices of Gabriel Del Virginia, 488 Madison Avenue-19th Floor, New York, New York 10022, 212-371-5478.

## 1.13 Company Background.

Natural Surroundings, Inc., is a New York corporation and operates an upscale florist catering to the retail trade.  The Debtor is located at 1351 Amsterdam Avenue in the borough of Manhattan, City of New York, and has operated since 1976. Prior to the economic downturn, the Debtor expanded its retail

operations, opening new branches and relocating its operation to larger quarters.

The Debtor's operations were severely disrupted by the tragic and untimely death of Mr. Steven Buckwald's brother and business partner in February, 2003. Thereafter, Mr. Buckwald was thrown into the sole management of the Debtor's operations with virtually no advance preparation for such contingency.

In an attempt to mitigate the effects of the death of his brother on the Debtor's operations, an individual was introduced to Mr. Buckwald to assist in the management of the Debtor. The result of this arrangement, unfortunately, was less than a success. While Mr. Buckwald focused the majority of his attention and efforts to sales and his vision of an expanded business, the Debtor's financial affairs were left unattended. Consequently, certain obligations went unpaid; most importantly FICA/withholding payments to the United States Internal Revenue Service for the years 2008 and 2009 in an amount upwards of $235,000.00.

Additionally, the challenging economic climate and the corresponding reduction in demand for the Debtor's high-end creations, caused the Debtor's expansion plans to stall, and to take a toll on the Debtor's cash resources.
Finally, an Federal law suit--instituted by a former employee that the Debtor asserts was nothing other than a vindictive attempt by said former employee to seek retribution for a dismissal--further taxed the Debtor's time and resources. Accordingly, Natural Surroundings was left in a position to devote its limited resources on attorneys' fees to clear the record as to its business practices and repair the damage to its reputation that the former employee's actions caused.

1.14 Description of the Bankruptcy Case.

The Debtor initiated the current chapter 11 proceeding on August 3, 2010 by filing a voluntary petition for relief under chapter 11 of Title 11 of the United States Code with the Bankruptcy Court. As of the date hereof, no request has been made for the appointment of a trustee or examiner in the Chapter 11 Case, and no official committees have been formed. Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtor continues to operate its business as a debtor-in-possession. The Debtor is a "small business debtor" as defined in section

101(51D) of the Bankruptcy Code.  The Honorable Allan L. Gropper
is presiding over the Debtor's Chapter 11 Case.

Thereafter, the Debtor filed its schedules of liabilities
and assets.  In its schedules, the Debtor lists a total of
approximately $103,440.99 in assets belonging to the Debtor.
That total predominately includes the estimated value of the
Debtor's various receivables and pre-petition bank accounts.  The
Debtor believes that the majority of the value of its company
comes from its good-will and extraordinary products and services
built up over three decades in the business.  Aside from those
nominal tangible assets listed in its schedule B, the Debtor has
no saleable tangible assets.

Law Offices of Gabriel Del Virginia filed an application
with the Bankruptcy Court to serve as counsel to the Debtor in
the Chapter 11 Case, and by order dated September 23, 2010, the
Bankruptcy Court authorized the retention of Law Offices of
Gabriel Del Virginia pursuant to section 327(a) of the Bankruptcy
Code *nunc pro tunc* to the Petition Date

The Court entered an order on November 22, 2010 fixing
January 11, 2011 for non-governmental units and January 31, 2011
for governmental units as the last day to file proofs of claim in
the Chapter 11 Case.  In accordance with the Bar Date Order, the
Debtor then caused a notice of the Bar Date, proof of claim form,
and an instruction sheet to the proof of claim form to be mailed
to all known parties in interest in this Chapter 11 Case.

Pursuant to the schedules and the proofs of claim filed with
the Bankruptcy Court, the Debtor believes it has total unsecured
debt of approximately $709,483.28.  The Debtor, however, has not
completed its comprehensive review of the claims that have been
filed and does not agree that each of the claims filed to date
are correct, accurate or valid.

The most significant filed claim filed against the Debtor,
is that of an individual plaintiff in a law suit pending in the
United States District Court, Southern District of New York and
bearing the caption, *Cristy Ruiz v. Natural Surroundings, Inc.,
et al.;* 10 Civ. 3654. (the "Ruiz Claim). The Ruiz claim (Claim
No. 20) seeks damages in the amount of $3,250,000.00 pursuant to
three alleged causes of action in the subject suit, each
requesting compensatory damages of $1million and civil penalties
of $250,000 in addition to counsel fees and punitive damages.

As the Debtor's legal advisors have analyzed the Ruiz claim and concluded it is largely without merit, the Debtor interposed an objection with the Court to the Ruiz claim, and such objection is pending. Without, however, the benefit of significant discovery respecting the Ruiz claim, the Debtor's legal advisors have considered the legal and factual issues, and estimate the value of the Ruiz claim as not more than $55,000.00.

The Debtor will review all of the proofs of claim that have been filed and, following such review, determine whether to interpose an objection to any proofs of claim. If the Debtor does object to one or more proofs of claim, reserves will have to be made until the Bankruptcy Court rules on such objections. This process, therefore, of reviewing, objecting to, and reserving for claims will likely affect distributions under the Plan.

On May 23, 2011 the Debtor filed its first Plan of Reorganization with the Bankruptcy Court, and filed this Amended Plan on January 31, 2012.

The Debtor believes that the instant Plan is feasible as required pursuant to § 1129 (a)(ii) of the Bankruptcy Code. Through its chapter 11 filing, Natural Surroundings's expects to free itself of its disputed creditors, dispose of all open, pending and threatened litigation, resolve any securities-related claims and permanently restore its reputation in the business community. With these claims and other allegations against it addressed, Natural Surroundings will be in a position to obtain the necessary funds to finalize the development of its products. A pro forma statement of operations setting forth the Debtor's anticipated business operations for the five-year period following confirmation is annexed hereto as Exhibit A.


1.15 Financial Information.

The Debtor has filed with the Bankruptcy Court, a Monthly Operating Report for each month the Chapter 11 Case has been pending. Upon confirmation, the Debtor expects to dedicate itself to developing its business and seek other and further opportunities. Furthermore, the Debtor requires investment capital in order to take its market position from its current state to a niche position for itself; but has no assurance of success.

The Debtor anticipates that the development of its expansion strategy will require an additional 18 to 36 months.  Until that time, the Debtor expects that its income will be similar to what it has been during the pendency of the Chapter 11 Case.

## II

## PLAN OVERVIEW.

Through the chapter 11 filing and the consummation of this Plan, Natural Surroundings will achieve all of its corporate goals for initiating these proceedings.  Upon confirmation of this Plan, all Allowed Claims will satisfied through the Debtor's operations and Natural Surroundings will then be on a firm financial footing to continue in its business.  Further, the Plan contemplates the implementation of a global injunction that would enjoin anybody from asserting any Claims against Natural Surroundings for Debts that arose before the Confirmation Date.

In general and without limiting the specifics set forth herein, this Plan can best be characterized as a "bootstrap plan".  Under the plan, if it is approved by the requisite number of creditors and the Bankruptcy Court, all general unsecured creditors of Natural Surroundings holding Allowed Claims will payments equal to .05 percentage of their Allowed Claims in satisfaction of same.  All Interests held by any party will be expunged, and all of New Common Stock will be issued to Mr. Sidney Buckwald, the father of Mr. Steven Buckwald, the principal of the Debtor, in exchange for his contribution of capital.  Through this mechanism, it is anticipated that Natural Surroundings will be able to better operate in the future and pay its obligations as they may come due without the immediate need to secure any additional funding.

## III

## DEFINITIONS.

For the purposes of the Plan, the following terms shall have the respective meanings set forth below (such meanings to be equally applicable to the singular and plural forms of the terms defined, unless the context otherwise requires):

"Administrative Claim" shall mean a claim for any cost or expense of administration in connection with the Chapter 11 Case allowed under section 503(b) of the Bankruptcy Code and entitled to priority under section 507(a)(1) of the Bankruptcy Code, including, without limitation, any actual, necessary costs and expenses of preserving the Debtor's estate and of operating the business of the Debtor, all allowances of compensation for legal or other professional services or reimbursement of costs and expenses under sections 330 and 503 of the Bankruptcy Code or otherwise allowed by the Court, and all fees and charges assessed against the Debtor's estate pursuant to chapter 123, title 28, United States Code.

"Allowed Claim" shall mean any Claim or portion of a Claim (a) which has been scheduled pursuant to section 521(1) of the Bankruptcy Code, other than a Claim scheduled by the Debtor as contingent, unliquidated or disputed; or (b) proof of which has been filed pursuant to section 501(a) of the Bankruptcy Code on or before the Bar Date, and as to which no objection to the allowance thereof has been interposed within the period of time fixed by the Bankruptcy Code, Bankruptcy Rules or an order of the Bankruptcy Court, or © as to which any objection has been determined by a Final Order of the Bankruptcy Court allowing such claim or any portion thereof, and Claims filed after the Bar Date are a nullity unless approved by an Order of the Bankruptcy Court.

"Avoidance Actions" shall mean any cause of action assertable under sections 510, 542, 543, 544, 545, 547, 548, 549, 550 or 553 of the Bankruptcy Code or state law if made applicable under such Bankruptcy Code sections.

"Ballot" shall mean the form transmitted to creditors with the Plan and Disclosure Statement, on which they may vote to accept or reject the Plan pursuant to Bankruptcy Rule 3018 and section 1126 of the Bankruptcy Code.

"Bankruptcy Code" shall mean Title 11 of the United States Code (§§101-1532).

"Bankruptcy Court" shall mean the United States Bankruptcy Court for the Southern District of New York, and any court having jurisdiction to hear appeals therefrom.

"Bankruptcy Rule(s)" shall mean the Federal Rules of Bankruptcy Procedure as applicable to cases under Title 11 of the United States Code and the Local Rules of the Bankruptcy Court, together

with all amendments and modifications made from time to time thereto.

"Bar Date" shall mean January 11, 2011, the date fixed by Order of the Bankruptcy Court by which Proofs of Claim of various categories must be filed against the Debtor.

"Business Day" shall mean any day other than a Saturday or Sunday or legal holiday as such term is defined in Bankruptcy Rule 9006.

"Cash" shall mean legal tender of the United States of America or cash equivalents.

"Chapter 11 Case" shall mean the above-captioned case commenced by the filing of a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

"Claim" shall mean a claim as defined in section 101(5) of the Bankruptcy Code, including without limitation, claims arising under section 502 of the Bankruptcy Code.

"Class" shall mean a class of holders of Claims or Interests described in Articles II and III of the Plan.

"Confirmation Date" shall mean the date upon which the Confirmation Order is entered by the Bankruptcy Court.

"Confirmation Hearing" shall mean the hearing held by the Bankruptcy Court, following notice, to determine whether or not to enter a Confirmation Order.

"Confirmation Order" shall mean the order of the Bankruptcy Court pursuant to section 1129 of the Bankruptcy Code confirming the Plan.

"Creditor" shall mean: (I) an entity that has a Claim against the Debtor that arose at the time of or before the Petition Date concerning the Debtor; or (ii) an entity that has a Claim against the Debtor's estate of the kind specified in sections 348(d), 502(f), 502(g), 502(h) or 502(I) of the Bankruptcy Code.

"Debt" shall mean a debt as defined in section 101(12) of the Bankruptcy Code, including without limitation, claims arising under section 502 of the Bankruptcy Code.

"Debtor" shall mean Natural Surroundings, Inc.

"Debtor-in-Possession" shall mean Debtor as debtor-in-possession under §§1107 and 1108 of the Bankruptcy Code.

"Disputed Claim" shall mean any Claim (other than an Allowed Claim): (I) which is scheduled pursuant to the Bankruptcy Code as disputed, contingent, unliquidated or in an amount of $0.00, or (ii) proof of which has been filed with the Bankruptcy Court and an objection to the allowance has been or is interposed within the period of time limitation fixed by the Bankruptcy Code, the Bankruptcy Rules or an order of the Bankruptcy Court for the filing of such objections, and as to which, such objection has not been determined by a Final Order of the Bankruptcy Court.

"Distribution Date" shall mean any date on which a distribution under the Plan is to be made to the holders of Allowed Claims.

"Effective Date" shall mean the date the Confirmation Order becomes a Final Order.

"Estate" shall mean the estate created by section 541 of the Bankruptcy Code.

"Estate Litigation Claims" shall mean any and all current and future causes of action under sections 547 through 552 of the Bankruptcy Code held by the Debtor.

"Executory Contract" shall mean any of the contracts and unexpired leases to which the Debtor is a party or was a party as of the Petition Date and which are executory within the meaning of section 365 of the Bankruptcy Code.

"Final Order" shall mean a Bankruptcy Court order or judgment which has not been reversed, stayed, modified, or amended and (I) as to which the time to appeal or seek review, rehearing, or certiorari has expired and as to which no appeal, petition for review, rehearing, or certiorari is pending; (ii) as to which any right to appeal or seek review, rehearing, or certiorari has been waived; or (iii) such order or judgment has been appealed and has been affirmed on appeal and the time for further appeal has expired; provided, however, that no order or judgment shall be deemed not to be a Final Order solely because such order or judgment is subject to the filing of a motion for reconsideration pursuant to section 502(e)(2) of the Bankruptcy Code or Bankruptcy Rules 3008 or 9024 or Rule 60 of the Federal Rules of Civil Procedure.

"General Unsecured Claim" shall mean any unsecured Claim which is not an Administrative Claim, Priority Claim, Priority Tax, or Interest and that arose before the filing of the Debtor's Chapter 11 Case and includes, without limitation, Claims based upon pre-petition trade accounts payable or Claims based upon the rejection of an executory contract during the pendency of the Chapter 11 Case.

"Insider" shall have the same meaning as that term is defined in section 101(31) of the Bankruptcy Code.

"Interest" shall mean any and all equity interests in the Debtor, as defined in section 101(16) of the Bankruptcy Code.

"Interest Holder" shall mean anyone who holds an Interest in the Debtor.

"New Common Stock" shall mean the shares of common stock, par value $.01 per share, of the Reorganized Debtor.

"Person" shall mean an individual, a corporation, a partnership (including a limited partnership), an association, a joint stock company, a joint venture, an estate, a trust, an unincorporated organization or a government or any political subdivision thereof or other entity.

"Petition Date" shall mean August 3, 2010, the date of the filing of the chapter 11 petition in this case.

"Plan" shall mean this Plan of Reorganization, either in its present form or as it may be altered, amended or modified from time to time.

"Priority Claim" shall mean a Claim allowable under section 507(a) of the Bankruptcy Code, other than an Administrative Claim or a Priority Tax Claim.

"Priority IRS Tax Claim" shall mean a Claim of the United States Treasury Department, Internal Revenue Service, either secured or unsecured, entitled to priority pursuant to section 507(a)(8) of the Bankruptcy Code.

"Professional Persons" shall mean, where applicable herein, Law Offices of Gabriel Del Virginia, counsel for the Debtor, and any other professionals who have been heretofore retained as per order of the Bankruptcy Court.

"Pro Rata" shall mean proportionally according to the total amount of Allowed Claims or Allowed Shareholder Interests in a particular Class.

"Reorganized Debtor" shall mean the Debtor as it is reconstituted on the Effective Date.

"Secured Claim" shall mean a Claim secured by a valid, properly perfected and enforceable mortgage, security interest and/or lien on property owned by the Debtor or upon the leasehold interest and assets of the Debtor, to the extent of the value of such Creditor's interest in the Debtor's estate's interest in such property.

**IV**

## DESIGNATION OF CLASSES OF CLAIMS AND INTERESTS.

Summary.

The categories of Claims and Interests set forth below classify all Claims against and Interests in the Debtor for all purposes of the Plan. The treatment with respect to each Class of Claims and Interests provided for in this Article II shall be in full and complete satisfaction, release and discharge of such Claims and Interests. Impaired claims are those that are not being paid in full.
Classification: The classification of Claims under this Plan is as follows:

| Class | Designation | Impairment | Entitled to Vote |
|---|---|---|---|
| 1a | JP Morgan Chase Secured Claim | Impaired | Yes |
| 1b | Valley National Bank Secured Claim | Impaired | Yes |
| 2 | Priority Tax Claim of IRS | Impaired | Yes |
| 3 | General Unsecured Claims | Impaired | Yes |
| 4 | Interest Holders | Impaired | No (deemed rejected) |

V

**<u>TREATMENT OF CLAIMS AND INTERESTS</u>**.

<u>Class 1a – JP Morgan Chase Secured Claim.</u>:
Classification:  Class 1a consists of the Secured Claim of JP Morgan Chase Bank, NA., filed in the amount of $231,284.36.

Treatment:  On the Effective Date, the Holder of Allowed Class 1a Claim shall retain the liens on the Debtor's property and receive monthly payments in cash in the amount of $700.00, pursuant to the terms of its agreement.

Voting:  Class 1a is an impaired class. Therefore, the Holder of the Claim in Class 1a is entitled to vote to accept or reject the Plan.

<u>Class 1b– Valley National Bank</u>:
Classification:  Class 1b consists of the Secured Claim of Valley National Bank, filed in the amount of and secured by a 2006 Ford Econoline Van; which vehicle is used by the Debtor in its day-to-day operations.

Treatment:  On the Effective Date, the Holder of Allowed Class 1b Claim shall retain the liens on the Debtor's property and receive monthly payments in cash in the amount of $250.00, pursuant to the terms of its agreement.

Voting:  Class 1b is an impaired class. Therefore, the Holder of the Claim in Class 1b is entitled to vote to accept or reject the Plan.

Class 2 – Priority IRS Tax Claim:
Classification:  Class 2 consists of the Priority IRS Tax Claim.

Treatment: Pursuant to Stipulation and Order entered by the Court on November 21, 2011, the Allowed Class 2 Priority IRS Tax Claim is allowed in the amount of $227,976.20 and the Holder of shall receive: (I) sixty (60) equal cash payments of $3,799.60, payable on the 15th of each month, commencing thirty days after the Effective Date.

Voting:  Class 2 is an impaired class. Therefore, the Holders of the Claim in Class 2 is entitled to vote to accept or reject the Plan.

Class 3 – General Unsecured Claims:
Classification:  Class 3 consists of all General Unsecured Claims.

Treatment: Commencing 60 days following the Effective Date, Holders of Allowed Class 3 General Unsecured Claims shall receive 60 equal monthly cash payments equal to .05% of their Allowed Class 3 Claims.  The Debtor estimates claims subject to distribution in the amount of $448,000.00 and corresponding monthly payments of approximately $400.00.

Voting:  Class 3 is an impaired class. Therefore, the Holders of the Claims in Class 3 are entitled to vote to accept or reject the Plan.


Class 4 – Interests:

Classification:  Class 4 consists of all Interests in the Debtor.

Treatment:  The Holders of Class 4 Interests will receive no distributions on account of such Interests and such Interests will be cancelled and fully extinguished pursuant to, and on the Effective Date of, the Plan.

Voting:  Class 4 is an Impaired Class.  Pursuant to section 1126(g) of the Bankruptcy Code, Holders of the Claims in Class 4 are deemed to reject the Plan and are not entitled to vote to accept or reject the Plan.

**VI**

## TREATMENT OF UNCLASSIFIED CLAIMS

### 6.01 Summary:

Pursuant to section 1123(a)(1) of the Bankruptcy Code, Administrative Claims against the Debtor are not classified for purposes of voting on, or receiving distributions. Under the Plan, Holders of such Claims are not entitled to vote. All such Claims are instead treated separately in accordance with this Article VI and in accordance with the requirements set forth in section 1129(a)(9)(A) of the Bankruptcy Code.

### 6.02 Administrative Claims:

Subject to the provisions of sections 507(a) of the Bankruptcy Code, each Holder of an Allowed Administrative Expense Claim will either be paid the full unpaid amount of such Allowed Administrative Expense Claim or, at the election of such Holder of an Allowed Administrative Expense Claim, upon such terms as agreed. This class consists of all Priority Claims except for the Priority IRS Tax Claim, and the Debtor has no creditors entitled to priority under 11 U.S.C. §§(3)-(7). Any Allowed Administrative Expense Claims and post-confirmation Administrative Expenses representing obligations incurred by the Debtor in the ordinary course of business, or otherwise assumed by the Debtor on the Effective Date pursuant to the Plan, including any tax obligations arising after the Petition Date, will be paid or performed by Reorganized Debtor when due in accordance with the terms and conditions of the particular agreements or non-bankruptcy law governing such obligations.

### 6.03 Professional Compensation:

All requests for payment of Professional Persons must be filed with the Bankruptcy Court and served on the Reorganized Debtor no later than forty-five (45) days after the Effective Date. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the allowed amounts of such requests shall be determined by the Bankruptcy Court. The Debtor estimates a cost of $35,000.00 for professional compensation.

# VII

## __MEANS FOR IMPLEMENTATION__.

### 7.01 Continued Corporate Existence:

The Debtor will continue to exist after the Effective Date as a corporation, with all of the powers of a corporation under applicable law under the same by-laws and articles as prior to the Petition Date.

The Plan shall be implemented as follows: from the Debtor's cash on hand, cash generated from ongoing operations, and cash contribution in the amount of $100,000.00 from Mr. Sidney Buckwald, the father of Mr. Steven Buckwald, the Debtor's principal.

# VIII

## __POST-CONFIRMATION MATTERS__.

### 8.01 Debtor's Charter:

On the Effective Date, the Debtor's Certificate of Incorporation shall continue as constituted.

### 8.02 Officers and advisors:

As of the Effective Date, Mr. Steven Buckwald, the Debtor's President and Chief Executive Officer will continue in those positions for the Reorganized Debtor. Mr. Buckwald, as founder of the Debtor has a wealth of knowledge about the industry and marketing, has, as noted, agreed to aid the Debtor by securing fresh funding, building the Debtor's core business, and developing any new opportunities.

### 8.03 Set-Offs:

The Debtor may, but shall not be required to, set-off against any Claim any payments or other distributions to be made pursuant to the Plan in respect of such Claim, but neither the failure to do so, nor the allowance of any Claim hereunder, shall constitute a waiver or release by the Debtor of any such Claim the Debtor may have against such Claimant.

21

## 8.04 Revesting and Retention of Claims and Interests:

Except as otherwise provided for in the Plan, upon the Effective Date, the property of the Estate will vest in the Reorganized Debtor, free and clear of all liens, Claims and Interests.   The Debtor may institute and prosecute the Estate Litigation Claims, and any litigation necessary to accomplish and effectuate the resolution of any of the claims.

## 8.05 Executory Contracts:

Assumption of Executory Contracts: Any Executory Contract set forth before the Confirmation Hearing in filing to the Court shall continue in full force and effect and be deemed assumed as of the Confirmation Date.   All other contracts that are executory, in whole or in part, to which the Debtor is a party shall be deemed rejected pursuant to section 365 and 1123 of the Bankruptcy Code as of the Confirmation Date, and the Debtor shall, to the best of its ability, provide notice at the last known address, to counter-parties.

Rejection Claims:   In the event that the rejection of an executory contract or unexpired lease by the Debtor pursuant to the Plan results in damages to the other party or parties to such contract or lease, a Claim for such damages, if not heretofore evidenced by a filed proof of claim, shall be forever barred and shall not be enforceable against the Debtor, or its respective properties or interests in property as agents, successors, or assigns, unless a proof of claim is filed with the Bankruptcy Court and served upon counsel for the Debtor on or before the date that is thirty (30) days after service of a notice of such rejection.   Any such proof of claim is not dispositive and the Debtor may interpose an objection to any such Claim on any basis.

### IX

### RESOLUTION OF DISPUTED CLAIMS & RESERVES.

## 9.01 Objections:

An objection to the allowance of a Claim shall be in writing and may be filed with the Bankruptcy Court by the Debtor or any other party in interest at any time on or before the Effective Date, but in no event later than ninety (90) days after the Effective Date – unless the Bankruptcy Court extends the time.

9.02 Late Filed Claims:

Claims filed after the Bar Date are a nullity unless otherwise ordered by the Bankruptcy Court.

9.03 Amendment of Claims:

A Claim may be amended after the Confirmation Date and prior to the Effective Date only as agreed upon by the Debtor and the holder of such Claim and as approved by the Bankruptcy Court or as otherwise permitted by the Bankruptcy Code and Bankruptcy Rules.  After the Effective Date, a Claim may be amended as agreed upon by the holder thereof and the Debtor to decrease, but not increase, the face amount thereof.

9.04 Reserve for Disputed Claims:

The Debtor shall reserve for each Disputed Claim that property which would otherwise be distributable to such holder on such Distribution Date were such Disputed Claim an Allowed Claim on the Effective Date, or such other property as the holder of such Disputed Claim and the Debtor may agree upon. Notwithstanding the foregoing sentence, the Debtor may reserve, with the approval of the Bankruptcy Court, with respect to one or more Disputed Claims, less than that amount of property which would otherwise be distributable to the holder of such Claim were such Disputed Claim(s) an Allowed Claim(s) on the Effective Date. The property so reserved for the holder, to the extent such Disputed Claim is allowed, and only after such Disputed Claim becomes a subsequently Allowed Claim, shall thereafter be distributed to such holder.

As of the date hereof, the Debtor only anticipates reserving the amount of $55,000.00 for the Ruiz Claim.

**X**

**EFFECT OF CONFIRMATION**.

10.01    Vesting of Property:

On the Confirmation Date, title to and possession of any and all property of the estate, real or personal, shall be re-vested in the Reorganized Debtor free and clear of all liens, claims, interests and encumbrances of any kind, subject to and except as otherwise provided in the Plan.

10.02      Discharge Granted Under Plan:

The rights afforded in the Plan and the payments and
distributions to be made hereunder shall discharge all causes of
action against the Debtor or the Estate that arose before the
Effective Date to the fullest extent permitted by section 1141 of
the Bankruptcy Code, including but not limited to all causes of
action of the kind specified in section 502(g), 502(h), or 502(I)
of the Bankruptcy Code, whether or not (I) a proof of claim based
upon such debt is filed or deemed filed under section 501 of the
Bankruptcy Code; (ii) a Claim based upon such debt is allowed
under section 502 of the Bankruptcy Code; or (iii) the holder of
a Claim based upon such debt has accepted the Plan.   The
Confirmation Order, except as provided herein or therein, shall
be a judicial determination of discharge of all Claims or causes
of action against the Debtor, and such discharge shall void any
judgment against the Debtor at any time obtained to the extent it
relates to a discharged claim or cause of action.

10.03      Releases:

Any consideration distributed under the Plan shall be in
exchange for and in complete satisfaction and release of all
Claims of any nature against the Debtor or any of its assets or
properties.

10.04      Exculpation:

Neither the Debtor, nor any of its respective members,
shareholders, officers, directors, employees, attorneys, advisors
or agents shall have or incur any liability to any holder of a
Claim or Interest for any act or omission in connection with, or
arising out of the Bankruptcy Case, pursuit to confirmation of
the Plan, the consummation of the Plan, or the administration of
the Plan or the property to be distributed under the Plan except
for fraud, willful misconduct or gross negligence.

10.05      Release by Debtor of Certain Parties:

As of the Effective Date, the Debtor shall be deemed to have
waived and released its present and former directors, officers,
employees, attorneys, consultants, advisors, and agents (acting
in such capacity) who were directors, officers, employees,
members, attorneys, consultants, advisors or agents,
respectively, at any time during the Chapter 11 Case from any and
all causes of action of the Debtor, including without limitation,
causes of action which the Debtor as the Debtor-in-Possession

otherwise has legal power to assert, compromise, or settle in connection with the Chapter 11 Case, arising on or prior to the Effective Date; provided, however, that the foregoing provisions shall not operate as a waiver or release of (I) contractual obligations owed by such person to the Debtor, or (ii) causes of action relating to such person's actions or omissions determined in a Final Order to have constituted gross negligence or willful misconduct.

10.06    Injunction:

Except as otherwise expressly provided in the Plan, any and all entities who have held, hold or may hold Claims or Interests against or in the Debtor, shall, as of the Confirmation Date, be permanently enjoined from taking any of the following actions against or affecting the Debtor or the Reorganized Debtor (the "Injunction Beneficiaries") with respect to such Claims or Interests (other than actions brought to enforce any rights or obligations under the Plan or appeals, if any, from the Confirmation Order):commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind against the Injunction Beneficiaries or the assets of the Injunction Beneficiaries or any direct or indirect successor in interest to the Injunction Beneficiaries or any assets of any such successor in interest; enforcing, levying, attaching, collecting or otherwise recovering by any manner or means whether directly or indirectly any judgment, award, decree or order against the Injunction Beneficiaries or the assets of the Injunction Beneficiaries or any direct or indirect successor in interest to the Injunction Beneficiaries, or any assets of any such successor in interest; creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Injunction Beneficiaries or the assets of the Injunction Beneficiaries or any direct or indirect successor in interest to the Injunction Beneficiaries, or any assets of any such successor in interest; and asserting any set-off, right of subrogation or recoupment of any kind, directly or indirectly against any obligation due the Injunction Beneficiaries or the assets of the Injunction Beneficiaries or any direct or indirect successor in interest to the Injunction Beneficiaries.

10.07    Effect of Confirmation:

The provisions hereof shall not apply in the event of fraud, gross negligence, willful misconduct, malpractice, criminal conduct, unauthorized use of confidential information that causes damages, or ultra vires acts, and will not limit the liability of

the Debtor's professionals to their client contrary to the requirements of DR 6-102 of the Code of Professional Responsibility. Nothing in the Confirmation order or the Plan of Reorganization shall effect a release of any claim by the United States Government or any of its agencies or any state and local authority whatsoever, including without limitation any claim arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority against the Released Parties, nor shall anything in the Confirmation Order or the Plan of Reorganization enjoin the United States or any state or local authority from bringing any claim, suit, action or other proceedings against the Released Parties for any liability whatever, including without limitation any claim, suit or action arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state or local authority, nor shall anything in the Confirmation Order or the Plan of Reorganization exculpate any party from any liability to the United States Government or any of its agencies or any state and local authority whatsoever, including any liabilities arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority against the Released Parties.

XI

CONDITIONS PRECEDENT TO
<u>EFFECTIVENESS OF THE PLAN.</u>

<u>11.01    Conditions to Effectiveness of the Plan:</u>

The Plan shall not become effective unless and until each of the following conditions has been satisfied or waived:

    (a)  The Bankruptcy Court enters the Confirmation Order; and

    (b)  The Confirmation Order becomes a Final Order.

XII

<u>PROVISIONS CONCERNING DISTRIBUTIONS</u>.

<u>12.01    Manner of Payments under the Plan:</u>

Payments to be made pursuant to the Plan shall be made by check drawn on a domestic bank. The Reorganized Debtor shall act as Disbursing Agent.

## 12.02    Fractional Cents:

Any other provision of the Plan to the contrary notwithstanding, no payments of fractions of cents will be made. Whenever any payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding of such fraction to the nearest whole cent (up or down).

Unclaimed Distributions: Except as otherwise provided herein, in the event any Claimant fails to claim any distribution within four (4) months from the date of such distribution, such Claimant shall forfeit all rights thereto, and to any and all future payments, and thereafter the Claim for which such cash was distributed shall be treated as a disallowed Claim, *provided that* the Debtor shall make a reasonable effort to locate a creditor whose mail is returned by the United States Postal Service as undeliverable. In this regard, distributions to Claimants entitled thereto shall be sent to their last known address set forth on a proof of claim filed with the Bankruptcy Court or if no proof of claim is filed, on the Schedules filed by the Debtor or to such other address as may be designated by a Creditor. All unclaimed cash shall be distributed to the Reorganized Debtor. Similarly, after such time, all unclaimed equity interests shall revert to the Debtor, and the claim of any other holder to such equity interest shall be discharged and forever barred.

## 12.03    Disputed Payments or Distribution:

If there is dispute between and among Claimants (including the entity or entities asserting the right to receive the disputed payment or distribution) as to the right of any entity to receive or retain any payment or distribution to be made to such entity under this Plan, the Debtor may, in lieu of making such payment or distribution to such entity, make it instead into an escrow account or to a distribution as ordered by a court of competent jurisdiction as the interested parties to such dispute may otherwise agree among themselves.

# XIII

## **VOTING INSTRUCTIONS**.

### 13.01    Voting of Claims:

Each holder of an Allowed Claim in Classes 1a, 1b, 2, and 3 shall be entitled to vote to accept or reject this Plan.  Holders of Interests in Class 4 are impaired, are deemed to have rejected the Plan and are not entitled to vote.  For purposes of calculating the number of Allowed Claims in a Class of Claims that have voted to accept or reject this Plan under section 1126 (c)of the Bankruptcy Code, all Allowed Claims in such Class held by one entity or any affiliate thereof (as defined in the Securities Act of 1933 and the rules and regulations promulgated thereunder) shall be aggregated and treated as one Allowed Claim in such Class.

### 13.02    Acceptance by a Class of Creditors:

Consistent with section 1126(c)of the Bankruptcy Code and except as provided for in section 1126(e) of the Bankruptcy Code, a Class of creditors shall have accepted this Plan if it is accepted by at least two-thirds (2/3) in dollar amount and more than one-half (½) in number of the holders of Allowed Claims of such Class that have timely and properly voted to accept or reject this Plan.  The votes of Insiders of the Debtor to accept the Plan will not be counted to determine acceptance, pursuant to Bankruptcy Code section 1129(a)(10).

### 13.03    Cramdown:

To the extent any Impaired Class of Claims entitled to vote on the Plan votes to reject the Plan, the Debtor reserves the right to request confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to such Class(es).

### 13.04    Submission of Ballots:

Pursuant to a Court order, ballots on the Debtor's Plan must be filed within a prescribed period of time.  All ballots should be properly completed as to whether the creditor accepts or rejects the Plan.  All ballots should be sent to Law Offices of Gabriel Del Virginia, 488 Madison Avenue-19th Floor, New York, New York 10022.

13.05     Blank Ballots:

Any ballot which is executed by the holder of an Allowed Claim or Interest, but which does not indicate an acceptance or rejection of the Plan, shall be deemed to be an acceptance of the Plan, in the amount set forth on the Debtor's Schedules, as may be amended.

## XIV

## ACCEPTANCE AND CONFIRMATION

14.01     Feasibility:

As a condition to confirmation of the Plan, § 1129(a)(ii) of the Bankruptcy Code requires that confirmation of the Plan is not likely to be followed by the liquidation of the Debtor, unless such liquidation is proposed in the plan.  As the Plan provides for the Debtor to be relieved of virtually all of its Debt, including, in particular, claims related to actions and allegations by Ruiz, the Debtor believes that the Plan meets this "feasibility" requirement and that it will be able to successfully operate as a going concern with this cloud removed. Furthermore, Mr. Steven Buckwald, the Debtor's founder is remaining with the Debtor and, as such, will be a significant and valuable aid to the Debtor in building the Debtor's core business and developing new opportunities.

14.02     "Best Interests" Test and "Cramdown":

Confirmation of the Plan also requires that each claimant either (I) accept the Plan or (ii) receive or retain under the Plan property of a value, as of the Effective Date of the Plan, that is not less than the value such claimant would receive or retain if the Debtor was to liquidate under Chapter 7 of the Bankruptcy Code.

To determine what creditors and holders of interests would receive if the Debtor was liquidated under Chapter 7, the Bankruptcy Court must determine the dollar amount that would be generated from the liquidation of the Debtor's assets and properties in the context of a Chapter 7 liquidation case.  Such cash amount may be further reduced by additional administrative and priority claims that may result from the termination of the

29

Debtor's business and the use of Chapter 7 for the purposes of liquidation.  Here, because the value of the Debtor is entirely related to its being able to further operate and Mr. Buckwald's experience and expertise, as well as the contemplated capital infusion which would cease in the event of a Chapter 7 liquidation, the Debtor estimates that if its assets were liquidated in Chapter 7 it is unlikely that unsecured creditors would receive *any* distribution.

The Debtor believes that comparing the value of the distributions available through a Chapter 7 liquidation to the value obtainable under reorganizing under Chapter 11 as set forth in the Plan, reveals that creditors will receive far greater value under the Plan.  Accordingly, the Plan satisfies the "best interest of creditors" test.

Cramdown:  To the extent any Impaired Class of Claims entitled to vote on the Plan votes to reject the Plan, the Debtor reserves the right to request confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to such Class(es).

**XV**

**POST-CONFIRMATION REPORTS AND FEES.**

The Reorganized Debtor shall pay all quarterly fees required under 28 U.S.C. § 1930 until the earlier of (a) entry of a final decree closing the Chapter 11 Case, and paying such fees as may be levied by the U.S. Trustee pursuant to 28 U.S.C. section 1930 as are assessed or (b) conversion or dismissal of the Chapter 11 Case.

**XVI**

**RETENTION OF JURISDICTION.**

The Bankruptcy Court shall retain jurisdiction of the Chapter 11 Case:

(a) To determine all controversies relating to, or concerning, the allowance of Claims upon objection to such Claims by any party in interest;

29

(b)  To determine requests for payment of Claims entitled to priority under section 507(a)(1) and 503(b) of the Bankruptcy Code, including any and all applications for compensation for professional and similar fees;

©   To determine and, if necessary, liquidate, any and all Claims arising from the rejection of any executory contracts; To determine any and all applications, adversary proceedings, and contested or litigated matters over which the Bankruptcy Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334;

(d)  To determine all disputed, contingent or unliquidated Claims;

(e)  To modify this Plan pursuant to section 1127 of the Bankruptcy Code or to remedy any defect or omission or reconcile any inconsistencies in this Plan or the Confirmation Order to the extent authorized by the Code;

(f)  To make such orders as are necessary or appropriate to carry out the provisions of this Plan;

(g)  To resolve controversies and disputes regarding the interpretation or enforcement of the terms of this Plan; and

(h)  To enter a final decree closing the Chapter 11 Case.


## XVII

### AVOIDANCE ACTIONS

17.01    Avoidance Actions:

The Debtor and Reorganized Debtor reserve the right to institute preference and fraudulent conveyance actions, and the like, pursuant to sections 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code, for a period of 120 days after the Effective Date.

## XVIII

## **CREDITOR'S COMMITTEE.**

18.01       Appointment:

An Official Committee of Unsecured Creditors has not been appointed in this Chapter 11 Case.

## XIX

## **GENERAL/MISCELLANEOUS PROVISIONS**.


19.01       Modification of the Plan and Notices:

The Debtor reserves the right, in accordance with the Bankruptcy Code, to amend or modify the Plan before to the Confirmation Date, but before substantial consummation, or as soon as practicable thereafter. After the Confirmation Date, the Debtor may, subject to order of the Bankruptcy Court, and in accordance with section 1127(b) of the Bankruptcy Code, remedy any defect or omission or reconcile any inconsistencies in the Plan in such manner as may be necessary to carry out the purposes and intent of the Plan.

Notices:  All notices and correspondence to the Debtor should be forwarded in writing to:

LAW OFFICES OF GABRIEL DEL VIRGINIA
488 Madison Avenue-19th Floor,
New York, New York 10022.
Attn: Gabriel Del Virginia, Esq.

19.02       Article and section References:

Unless otherwise specified, all section, article and exhibit references in the Plan are to the respective section in, article of, or exhibit to the Plan.  The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions of the Plan; words denoting the singular number shall include the plural number and vice versa, and words denoting one gender shall include the other gender.

19.03       Payment Dates:

        If any payment or act under the Plan is required to be made
or falls on a date which shall be a Saturday, Sunday or a legal
holiday, then the making of such payment or performance of such
act may be completed on the next succeeding business day, but
shall be deemed to have been completed as of the required date.

19.04       Enforceability:

        Should any provision in the Plan be determined to be
unenforceable, such determination shall in no way limit or affect
the enforceability or operative effect of any and all other
provisions of the Plan.

19.05       Applicable Law:

        Except to the extent that the Bankruptcy Code is applicable,
the rights and obligations arising under the Plan shall be
governed by, and construed and enforced in accordance with, the
law of the State of New York.

19.06       Successors and Assigns:

        The rights and obligations of any entity named or referred
to in the Plan shall be binding upon and inure to the benefit of
the successors and assigns of such entity.


19.07       Reservation of Rights:

        It is the Debtor's position that, if the Effective Date does
not occur, neither this Plan nor any statement contained herein
may be used or relied upon in any manner in any suit, action,
proceeding or controversy within or outside the Chapter 11 case.

Dated:     March 5, 2012
           New York, New York


Respectfully submitted,

Natural Surroundings, Inc.

By: /s/ _____
Name: Mr. Steven Buckwald,
Title: President.
           -and-
**LAW OFFICES OF GABRIEL DEL VIRGINIA**
*Attorneys for the Debtor and*
*Debtor-in-Possession*

By: /s/ Gabriel Del Virginia
Gabriel Del Virginia (GDV-4951)
488 Madison Ave-19th Floor,
New York, New York  10022
Telephone: 212-371-5478
Facsimile: 212-371-0460

# Exhibit A

## YEAR 2012 APR - DEC

| | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV |
|---|---|---|---|---|---|---|---|---|
| **SALE RECEIPTS** | 147,677 | 208,893 | 152,163 | 92,688 | 82,421 | 118,808 | 145,692 | 123,619 |
| | | | | | | | | |
| **COST OF GOOD SOLD** | | | | | | | | |
| **INVENTORY** | 36,299 | 52,580 | 38,889 | 23,707 | 21,486 | 30,246 | 36,616 | 31,751 |
| **DELIVERY** | 12,090 | 17,101 | 12,457 | 7,588 | 6,747 | 9,726 | 11,927 | 10,120 |
| **OPERATING PAYROLL** | 30,328 | 42,900 | 31,249 | 19,035 | 16,926 | 24,399 | 29,920 | 25,387 |
| **OTHER** | 1,951 | 2,759 | 2,010 | 1,224 | 1,089 | 1,569 | 1,925 | 1,633 |
| **TOTAL COGS** | 80,667 | 115,340 | 84,605 | 51,554 | 46,248 | 65,941 | 80,388 | 68,891 |
| | | | | | | | | |
| **EXPENSES** | | | | | | | | |
| **TELEFLORA** | 3,847 | 5,442 | 3,964 | 2,415 | 2,147 | 3,095 | 3,795 | 3,220 |
| **MARKETING** | 3,600 | 2,000 | 800 | 400 | 500 | 300 | 3,600 | 1,800 |
| **HEALTH INSURANCE** | 2,593 | 2,593 | 2,593 | 2,593 | 2,593 | 2,593 | 2,593 | 2,593 |
| **SALARIES** | 19,313 | 19,313 | 19,313 | 19,313 | 19,313 | 19,313 | 19,313 | 19,313 |
| **PAYROLL TAXES** | 3,916 | 4,390 | 3,618 | 2,866 | 2,529 | 2,437 | 2,506 | 2,139 |
| **OFFICE SUPPLIES/EQUIPMENT** | 750 | 1,200 | 1,200 | 750 | 500 | 1,000 | 1,200 | 750 |
| **UTILITIES** | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 |
| **OTHER EXPENSES** | 3,848 | 1,673 | 1,672 | 1,598 | 1,598 | 1,672 | 1,598 | 1,598 |
| **TOTAL EXPENSES** | 40,866 | 39,611 | 36,160 | 32,934 | 32,180 | 33,410 | 37,605 | 34,413 |
| | | | | | | | | |
| **OTHER EXPENSES** | | | | | | | | |
| **RENT** | 12,075 | 12,075 | 12,075 | 12,075 | 12,075 | 12,075 | 12,075 | 12,075 |
| **INSURANCE** | 1,281 | 1,392 | 1,256 | 1,124 | 1,106 | 1,256 | 335 | 290 |
| **BANK CHARGES** | 190 | 190 | 190 | 190 | 190 | 190 | 190 | 190 |
| **TOTAL OTHER EXPENSES** | 13,546 | 13,657 | 13,521 | 13,389 | 13,371 | 13,521 | 12,600 | 12,555 |
| | | | | | | | | |
| **NET RECEIPTS** | 12,598 | 40,285 | 17,877 | (5,189) | (9,379) | 5,936 | 15,099 | 7,760 |
| | | | | | | | | |
| **CHAPTER 11 OBLIGATIONS** | | | | | | | | |
| **CHASE** | 700 | 700 | 700 | 700 | 700 | 700 | 700 | 700 |
| **VAN NOTE** | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 |
| **FEDERAL TAXES** | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 |
| **UNSECURED DEBT** | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 |
| **TOTAL** | 5,350 | 5,350 | 5,350 | 5,350 | 5,350 | 5,350 | 5,350 | 5,350 |
| | | | | | | | | |
| **TOTAL NET CASH FLOW** | 7,248 | 34,935 | 12,527 | (10,539) | (14,729) | 586 | 9,749 | 2,410 |

**Year 2013**

| | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OC |
|---|---|---|---|---|---|---|---|---|---|---|
| SALE RECEIPTS | 124,377 | 178,438 | 136,740 | 154,118 | 217,730 | 157,088 | 95,955 | 85,848 | 124,698 | 150,97 |
| | | | | | | | | | | |
| COST OF GOOD SOLD | | | | | | | | | | |
| INVENTORY | 31,097 | 44,952 | 34,596 | 38,725 | 55,301 | 40,178 | 24,551 | 22,159 | 31,837 | 38,31 |
| DELIVERY | 10,140 | 14,658 | 11,281 | 12,628 | 18,033 | 13,102 | 8,006 | 7,226 | 10,381 | 12,49 |
| OPERATING PAYROLL | 24,337 | 35,179 | 27,075 | 30,307 | 43,279 | 31,444 | 19,214 | 17,342 | 24,916 | 29,98 |
| OTHER | 2,028 | 2,932 | 2,256 | 2,526 | 3,607 | 2,620 | 1,601 | 1,445 | 2,076 | 2,49 |
| TOTAL COGS | 67,603 | 97,721 | 75,209 | 84,186 | 120,219 | 87,344 | 53,371 | 48,171 | 69,210 | 83,30 |
| | | | | | | | | | | |
| EXPENSES | | | | | | | | | | |
| TELEFLORA | 3,240 | 4,648 | 3,562 | 4,015 | 5,672 | 4,092 | 2,500 | 2,236 | 3,248 | 3,93 |
| MARKETING | 3,666 | 400 | 600 | 3,600 | 2,000 | 800 | 400 | 500 | 300 | 3,60 |
| HEALTH INSURANCE | 2,593 | 2,593 | 2,593 | 2,593 | 2,593 | 2,593 | 2,593 | 2,593 | 2,593 | 2,59 |
| SALARIES | 19,313 | 19,313 | 19,313 | 19,313 | 19,313 | 19,313 | 19,313 | 19,313 | 19,313 | 19,31 |
| PAYROLL TAXES | 5,772 | 7,121 | 4,798 | 3,929 | 4,434 | 3,644 | 2,887 | 2,562 | 2,471 | 2,51 |
| OFFICE SUPPLIES/EQUIPMENT | 750 | 1,200 | 1,200 | 750 | 1,200 | 1,200 | 750 | 500 | 1,000 | 1,20 |
| UTILITIES | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,00 |
| OTHER EXPENSES | 1,713 | 1,673 | 1,672 | 1,598 | 1,673 | 1,672 | 1,598 | 1,598 | 1,672 | 1,59 |
| TOTAL EXPENSES | 40,047 | 39,948 | 36,739 | 38,797 | 39,885 | 36,314 | 33,040 | 32,301 | 33,598 | 37,75 |
| | | | | | | | | | | |
| OTHER EXPENSES | | | | | | | | | | |
| RENT | 12,075 | 12,075 | 12,075 | 12,075 | 12,075 | 12,075 | 12,075 | 12,075 | 12,075 | 12,07 |
| INSURANCE | 7,868 | 3,322 | 3,197 | 1,666 | 1,787 | 1,598 | 1,424 | 1,404 | 1,667 | 66 |
| BANK CHARGES | 190 | 190 | 190 | 190 | 190 | 190 | 190 | 190 | 190 | 19 |
| TOTAL OTHER EXPENSES | 20,133 | 15,587 | 15,462 | 13,931 | 14,052 | 13,863 | 13,689 | 13,669 | 13,932 | 12,93 |
| | | | | | | | | | | |
| NET RECEIPTS | (3,406) | 25,182 | 9,331 | 17,204 | 43,574 | 19,566 | (4,145) | (8,294) | 7,959 | 16,98 |
| | | | | | | | | | | |
| CHAPTER 11 OBLIGATIONS | | | | | | | | | | |
| CHASE | 700 | 700 | 700 | 700 | 700 | 700 | 700 | 700 | 700 | 70 |
| VAN NOTE | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 25 |
| FEDERAL TAXES | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,00 |
| UNSECURED DEBT | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 40 |
| TOTAL | 5,350 | 5,350 | 5,350 | 5,350 | 5,350 | 5,350 | 5,350 | 5,350 | 5,350 | 5,35 |
| | | | | | | | | | | |
| TOTAL NET CASH FLOW | (8,756) | 19,832 | 3,981 | 11,854 | 38,224 | 14,216 | (9,495) | (13,644) | 2,609 | 11,63 |

**Year 2014**

| | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | N |
|---|---|---|---|---|---|---|---|---|---|---|---|
| SALE RECEIPTS | 130,425 | 186,649 | 142,354 | 160,558 | 226,567 | 162,014 | 99,222 | 89,275 | 130,588 | 156,255 | 134,79 |
| | | | | | | | | | | | |
| COST OF GOOD SOLD | | | | | | | | | | | |
| INVENTORY | 32,609 | 47,020 | 36,017 | 40,344 | 57,546 | 41,438 | 25,387 | 23,043 | 33,340 | 39,660 | 34,55 |
| DELIVERY | 10,633 | 15,333 | 11,745 | 13,156 | 18,765 | 13,512 | 8,278 | 7,514 | 10,872 | 12,932 | 11,20 |
| OPERATING PAYROLL | 25,520 | 36,798 | 28,187 | 31,573 | 45,036 | 32,430 | 19,868 | 18,034 | 26,092 | 31,038 | 27,04 |
| OTHER | 2,127 | 3,067 | 2,349 | 2,631 | 3,753 | 2,702 | 1,656 | 1,503 | 2,174 | 2,586 | 2,25 |
| TOTAL COGS | 70,890 | 102,217 | 78,297 | 87,704 | 125,099 | 90,083 | 55,188 | 50,094 | 72,479 | 86,216 | 75,1 |
| | | | | | | | | | | | |
| EXPENSES | | | | | | | | | | | |
| TELEFLORA | 3,398 | 4,862 | 3,708 | 4,183 | 5,902 | 4,221 | 2,585 | 2,326 | 3,402 | 4,070 | 3,5 |
| MARKETING | 3,666 | 400 | 600 | 3,600 | 2,000 | 800 | 400 | 500 | 300 | 3,600 | 1,80 |
| HEALTH INSURANCE | 2,593 | 2,593 | 2,593 | 2,593 | 2,593 | 2,593 | 2,593 | 2,593 | 2,593 | 2,593 | 2,59 |
| SALARIES | 19,313 | 19,313 | 19,313 | 19,313 | 19,313 | 19,313 | 19,313 | 19,313 | 19,313 | 19,313 | 19,3 |
| PAYROLL TAXES | 5,912 | 7,315 | 4,902 | 4,020 | 4,550 | 3,709 | 2,930 | 2,604 | 2,530 | 2,568 | 2,2 |
| OFFICE SUPPLIES/EQUIPMENT | 750 | 1,200 | 1,200 | 750 | 1,200 | 1,200 | 750 | 500 | 1,000 | 1,200 | 75 |
| UTILITIES | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,00 |
| OTHER EXPENSES | 1,713 | 1,673 | 1,672 | 1,598 | 1,673 | 1,672 | 1,598 | 1,598 | 1,672 | 1,598 | 1,59 |
| TOTAL EXPENSES | 40,345 | 40,356 | 36,989 | 39,056 | 40,230 | 36,507 | 33,168 | 32,433 | 33,810 | 37,942 | 34,72 |
| | | | | | | | | | | | |
| OTHER EXPENSES | | | | | | | | | | | |
| RENT | 12,075 | 12,075 | 12,075 | 12,075 | 12,075 | 12,075 | 12,075 | 12,075 | 12,075 | 12,075 | 12,07 |
| INSURANCE | 7,868 | 3,342 | 3,210 | 1,684 | 1,810 | 1,611 | 1,432 | 1,412 | 1,685 | 682 | 63 |
| BANK CHARGES | 190 | 190 | 190 | 190 | 190 | 190 | 190 | 190 | 190 | 190 | 19 |
| TOTAL OTHER EXPENSES | 20,133 | 15,607 | 15,475 | 13,949 | 14,075 | 13,876 | 13,697 | 13,677 | 13,950 | 12,947 | 12,89 |
| | | | | | | | | | | | |
| NET RECEIPTS | (943) | 28,469 | 11,594 | 19,850 | 47,163 | 21,548 | (2,832) | (6,930) | 10,349 | 19,149 | 12,00 |
| | | | | | | | | | | | |
| CHAPTER 11 OBLIGATIONS | | | | | | | | | | | |
| CHASE | 700 | 700 | 700 | 700 | 700 | 700 | 700 | 700 | 700 | 700 | 70 |
| VAN NOTE | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 25 |
| FEDERAL TAXES | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,00 |
| UNSECURED DEBT | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 40 |
| TOTAL | 5,350 | 5,350 | 5,350 | 5,350 | 5,350 | 5,350 | 5,350 | 5,350 | 5,350 | 5,350 | 5,35 |
| | | | | | | | | | | | |
| TOTAL NET CASH FLOW | (6,293) | 23,119 | 6,244 | 14,500 | 41,813 | 16,198 | (8,182) | (12,280) | 4,999 | 13,799 | 6,65 |

**Year 2015**

| | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT |
|---|---|---|---|---|---|---|---|---|---|---|
| **SALE RECEIPTS** | 136,472 | 194,860 | 147,968 | 166,999 | 235,404 | 166,939 | 102,489 | 92,702 | 136,478 | 161,536 |
| | | | | | | | | | | |
| **COST OF GOOD SOLD** | | | | | | | | | | |
| **INVENTORY** | 34,121 | 49,088 | 37,437 | 41,962 | 59,790 | 42,698 | 26,222 | 23,928 | 34,844 | 41,000 |
| **DELIVERY** | 11,127 | 16,007 | 12,208 | 13,683 | 19,497 | 13,923 | 8,551 | 7,803 | 11,362 | 13,370 |
| **OPERATING PAYROLL** | 26,704 | 38,417 | 29,299 | 32,840 | 46,792 | 33,416 | 20,522 | 18,726 | 27,269 | 32,087 |
| **OTHER** | 2,225 | 3,201 | 2,442 | 2,737 | 3,899 | 2,785 | 1,710 | 1,561 | 2,272 | 2,674 |
| **TOTAL COGS** | 74,177 | 106,714 | 81,385 | 91,222 | 129,978 | 92,821 | 57,005 | 52,017 | 75,748 | 89,131 |
| | | | | | | | | | | |
| **EXPENSES** | | | | | | | | | | |
| **TELEFLORA** | 3,555 | 5,076 | 3,855 | 4,350 | 6,132 | 4,349 | 2,670 | 2,415 | 3,555 | 4,208 |
| **MARKETING** | 3,666 | 400 | 600 | 3,600 | 2,000 | 800 | 400 | 500 | 300 | 3,600 |
| **HEALTH INSURANCE** | 2,358 | 2,593 | 2,593 | 2,593 | 2,593 | 2,593 | 2,593 | 2,593 | 2,593 | 2,593 |
| **SALARIES** | 19,313 | 19,313 | 19,313 | 19,313 | 19,313 | 19,313 | 19,313 | 19,313 | 19,313 | 19,313 |
| **PAYROLL TAXES** | 6,053 | 7,509 | 5,006 | 4,111 | 4,665 | 3,773 | 2,973 | 2,647 | 2,589 | 2,616 |
| **OFFICE SUPPLIES/EQUIPMENT** | 750 | 1,200 | 1,200 | 750 | 1,200 | 1,200 | 750 | 500 | 1,000 | 1,200 |
| **UTILITIES** | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 |
| **OTHER EXPENSES** | 1,713 | 1,673 | 1,672 | 1,598 | 1,673 | 1,672 | 1,598 | 1,598 | 1,672 | 1,598 |
| **TOTAL EXPENSES** | 40,408 | 40,763 | 37,239 | 39,315 | 40,576 | 36,700 | 33,297 | 32,565 | 34,023 | 38,128 |
| | | | | | | | | | | |
| **OTHER EXPENSES** | | | | | | | | | | |
| **RENT** | 12,075 | 12,075 | 12,075 | 12,075 | 12,075 | 12,075 | 12,075 | 12,075 | 12,075 | 12,075 |
| **INSURANCE** | 7,868 | 3,362 | 3,223 | 1,702 | 1,833 | 1,623 | 1,440 | 1,421 | 1,703 | 695 |
| **BANK CHARGES** | 190 | 190 | 190 | 190 | 190 | 190 | 190 | 190 | 190 | 190 |
| **TOTAL OTHER EXPENSES** | 20,133 | 15,627 | 15,488 | 13,967 | 14,098 | 13,888 | 13,705 | 13,686 | 13,968 | 12,960 |
| | | | | | | | | | | |
| **NET RECEIPTS** | 1,754 | 31,756 | 13,857 | 22,495 | 50,752 | 23,530 | (1,518) | (5,567) | 12,739 | 21,317 |
| | | | | | | | | | | |
| **CHAPTER 11 OBLIGATION** | | | | | | | | | | |
| **CHASE** | 700 | 700 | 700 | 700 | 700 | 700 | 700 | 700 | 700 | 700 |
| **VAN NOTE** | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 |
| **FEDERAL TAXES** | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 |
| **UNSECURED DEBT** | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 |
| **TOTAL** | 5,438 | 5,438 | 5,462 | 5,100 | 5,100 | 5,100 | 5,100 | 5,100 | 5,100 | 5,100 |
| | | | | | | | | | | |
| **TOTAL NET CASH FLOW** | (3,684) | 26,318 | 8,395 | 17,395 | 45,652 | 18,430 | (6,618) | (10,667) | 7,639 | 16,217 |

**Year 2016**

| | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | O |
|---|---|---|---|---|---|---|---|---|---|---|
| **SALE RECEIPTS** | 142,519 | 203,071 | 153,582 | 173,439 | 244,242 | 171,865 | 105,755 | 96,129 | 142,368 | 166,81 |
| | | | | | | | | | | |
| **COST OF GOOD SOLD** | | | | | | | | | | |
| **INVENTORY** | 35,633 | 51,157 | 38,857 | 43,580 | 62,035 | 43,958 | 27,058 | 24,812 | 36,348 | 42,34 |
| **DELIVERY** | 11,620 | 16,682 | 12,671 | 14,211 | 20,229 | 14,334 | 8,823 | 8,091 | 11,853 | 13,80 |
| **OPERATING PAYROLL** | 27,887 | 40,036 | 30,410 | 34,106 | 48,549 | 34,402 | 21,176 | 19,418 | 28,446 | 33,13 |
| **OTHER** | 2,324 | 3,336 | 2,534 | 2,842 | 4,046 | 2,867 | 1,765 | 1,618 | 2,371 | 2,76 |
| **TOTAL COGS** | 77,464 | 111,211 | 84,473 | 94,740 | 134,858 | 95,560 | 58,822 | 53,940 | 79,017 | 92,04 |
| | | | | | | | | | | |
| **EXPENSES** | | | | | | | | | | |
| **TELEFLORA** | 3,713 | 5,290 | 4,001 | 4,518 | 6,363 | 4,477 | 2,755 | 2,504 | 3,709 | 4,34 |
| **MARKETING** | 3,666 | 400 | 600 | 3,600 | 2,000 | 800 | 400 | 500 | 300 | 3,60 |
| **HEALTH INSURANCE** | 2,358 | 2,593 | 2,593 | 2,593 | 2,593 | 2,593 | 2,593 | 2,593 | 2,593 | 2,59 |
| **SALARIES** | 19,313 | 19,313 | 19,313 | 19,313 | 19,313 | 19,313 | 19,313 | 19,313 | 19,313 | 19,31 |
| **PAYROLL TAXES** | 6,193 | 7,702 | 5,110 | 4,202 | 4,780 | 3,838 | 3,017 | 2,689 | 2,648 | 2,66 |
| **OFFICE SUPPLIES/EQUIPMENT** | 750 | 1,200 | 1,200 | 750 | 1,200 | 1,200 | 750 | 500 | 1,000 | 1,20 |
| **UTILITIES** | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,00 |
| **OTHER EXPENSES** | 1,713 | 1,673 | 1,672 | 1,598 | 1,673 | 1,672 | 1,598 | 1,598 | 1,672 | 1,59 |
| **TOTAL EXPENSES** | 40,706 | 41,171 | 37,489 | 39,574 | 40,921 | 36,893 | 33,425 | 32,697 | 34,235 | 38,31 |
| | | | | | | | | | | |
| **OTHER EXPENSES** | | | | | | | | | | |
| **RENT** | 12,075 | 12,075 | 12,075 | 12,075 | 12,075 | 12,075 | 12,075 | 12,075 | 12,075 | 12,07 |
| **INSURANCE** | 7,868 | 3,382 | 3,236 | 1,720 | 1,856 | 1,636 | 1,448 | 1,429 | 1,722 | 70 |
| **BANK CHARGES** | 190 | 190 | 190 | 190 | 190 | 190 | 190 | 190 | 190 | 19 |
| **TOTAL OTHER EXPENSES** | 20,133 | 15,647 | 15,501 | 13,985 | 14,121 | 13,901 | 13,713 | 13,694 | 13,987 | 12,97 |
| | | | | | | | | | | |
| **NET RECEIPTS** | 4,216 | 35,042 | 16,120 | 25,141 | 54,342 | 25,511 | (205) | (4,203) | 15,129 | 23,48 |
| | | | | | | | | | | |
| **CHAPTER 11 OBLIGATIONS** | | | | | | | | | | |
| **CHASE** | 700 | 700 | 700 | 700 | 700 | 700 | 700 | 700 | 700 | 70 |
| **VAN NOTE** | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 25 |
| **FEDERAL TAXES** | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,00 |
| **UNSECURED DEBT** | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 40 |
| **TOTAL** | 5,350 | 5,350 | 5,350 | 5,350 | 5,350 | 5,350 | 5,350 | 5,350 | 5,350 | 5,35 |
| | | | | | | | | | | |
| **TOTAL NET CASH FLOW** | (1,134) | 29,692 | 10,770 | 19,791 | 48,992 | 20,161 | (5,555) | (9,553) | 9,779 | 18,13 |

# Exhibit B

**NATURAL SURROUNDINGS**
**LIQUIDATION ANALYSIS**
**AS OF 3/1/12**

**<u>ASSETS</u>**

| | |
|---|---:|
| **CASH ON HAND** | 93,410 |
| **VEHICLES** | 25,000 |
| **LEASE SECURITY** | 22,600 |
| **RECEIVABLES** | 15,814 |
| **INVENTORY** | 3,200 |
| **2 WALK IN COOLERS** | 3,000 |
| **COMPUTERS/PRINTERS** | 2,000 |
| **FURNITURE** | 1,000 |
| **TOTAL ASSETS** | 166,024 |

**<u>LIABILITIES</u>**
**SECURED CLAIMS**

| | |
|---|---:|
| **JP MORGAN CHASE** | 231,284 |
| **VNB (VAN NOTE)** | <u>13,720</u> |
| **TOTAL SECURED CLAIMS** | 245,004 |
| | |
| **CHAPTER 7 ESTIMATED ADMIN EXP** | 15,000 |
| **CHAPTER 11 ESTIMATED ADMIN EXP** | 35,000 |
| | |
| **PRIORITY TAX CLAIMS** | |
| **IRS** | 227,976 |
| | |
| **GENERAL UNSECURED CLAIMS** | 448,148 |
| | |
| **TOTAL LIABILITIES** | 971,128 |
| | |
| **DIFFERENCE** | (805,104) |